The Full Commission has reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Dollar and upon the briefs and argument of counsel. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Decision and Order and enters the following Decision and Order.
This case was originally heard by Deputy Commissioner Dollar in Charlotte on March 24, 1994. Following the hearing, the record remained open for the taking of necessary depositions. Thereafter, the deposition of Dr. Kevin Kilbride was submitted into evidence. Upon receipt of the parties' trial briefs, the record in this matter was duly closed.
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing as:
STIPULATIONS
1. This is an action properly before the North Carolina Industrial Commission under the State Tort Claims Act, and all parties have been properly served.
2. This is an action alleging medical malpractice against Dr. Robert T. Coffey who is employed by the defendant North Carolina Department of Human Resources, specifically by Broughton Hospital in Morganton, North Carolina.
3. The parties have stipulated all medical records of Rannie Johnson from Broughton Hospital, Piedmont Area Mental Health Center, and Union Memorial Hospital.
4. The parties have stipulated to the following documents being entered into the record:
 a. All records and notes of the Waxhaw Police Department relative to the investigation into the death of Rannie Johnson on January 5, 1992;
 b. All documents pertaining to the cooperative agreement for single portal entry designation between Piedmont Area Mental Health Center and Broughton Hospital, which existed prior to January 15, 1992;
 c. Written admission rules, regulations, policies, and procedures of Broughton Hospital;
 d. Depositions and Exhibits of Dr. Robert Coffey and Dr. John Billinsky;
 e. All pleadings and discovery in this action; and
f. Death Certificate of Rannie Johnson.
5. Sharon Johnson is a duly qualified executrix for the estate of Rannie Melton Johnson, Jr.
* * * * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission rejects the findings made by the Deputy Commissioner and makes the following:
FINDINGS OF FACT
1. On or about January 13, 1992, the decedent Rannie Johnson was a 45 year old male who had first been admitted at Broughton Hospital in 1965, and had been admitted periodically at Broughton Hospital for a total of 19 times in subsequent years, both on a voluntary and involuntary basis. Mr. Johnson had been diagnosed as having a schizoaffective disorder, depressed type and a dependent personality disorder. The decedent had a prior self-inflicted gunshot wound to the abdomen in 1985, and had driven his vehicle into a lake in 1980; both were suicide attempts. Mr. Johnson had a long history of mental illness and his mental health was monitored by the Union County Area Mental Health Department.
2. The decedent had been married three previous times, with his fourth marriage being in 1981 to Sharon Johnson, his present wife. Mr. Johnson had 5 children of his previous marriages.
3. The decedent experienced episodes of depression around December 25 (Christmas) and January 14 (decedent's birthday), and would seek mental health counseling at those times, and other times as the need arose.
4. On January 13, 1992, the day before his 46th birthday, Mr. Johnson complained of severe depression and was taken by his wife to the Union County Area Mental Health Department where he was seen by social worker Jim Shaw, who was a therapist and case manager. Mr. Shaw worked under the supervision of Dr. McDonald, who was a psychiatrist. Mr. Johnson expressed to Mr. Shaw that he was "thinking about killing himself". Mr. Shaw determined he was suicidal and he prepared a report recommending Rannie Johnson's re-admission to Broughton Hospital, sealed his report in an envelope, and directed Mrs. Johnson and the decedent's mother to drive Mr. Johnson to Broughton Hospital for admission, and for them to give the envelope to the admitting physician. The sealed report indicated Mr. Johnson appeared depressed and suicidal.
5. Broughton and the Union County Area Mental Health Department had previously entered into a Single Portal of Entry Agreement. (Pl's Exh. 3, Def's Exh. 4) The purpose of that agreement was to establish a procedure for screening and admitting patients to Broughton Hospital. It established both a procedure for the admission of patients and a procedure to be followed in the event admission at Broughton was denied. Broughton had never previously denied admission to a patient referred by Union County. (T p 99).
6. During crises, the decedent had been involuntarily committed for mental health treatment on a few occasions.
7. On January 13, 1992, Mrs. Johnson and decedent's mother drove the decedent to Morganton to Broughton Hospital.
8. Dr. Robert Coffey was the admitting physician at the time Rannie Johnson presented himself for admission. Dr. Coffey had retired from the practice of psychiatry in 1987, but he joined the staff of Broughton in December, 1990. (Dr. Coffey was 72 at the time of the trial of this matter.) Dr. Coffey had met Rannie Johnson during a previous hospitalization but had never participated in evaluating him for admission.
9. When Rannie Johnson arrived at Broughton he requested admission and was interviewed by Dr. Coffey for less than an hour. Dr. Coffey denied admission to Rannie Johnson even after receiving the sealed report from Union County Area Mental Health.
10. Dr. Coffey reviewed Mr. Shaw's notes, and discussed suicidal ideations with the decedent. After interviewing decedent, Dr. Coffey concluded based upon Mr. Johnson's demeanor, his denial of suicidal ideations as reported by Mr. Shaw, and his past admission history, that the decedent should not be admitted but should be returned to the least restrictive environmental setting.
11. Dr. Coffey advised Mrs. Johnson and the decedent's mother that the decedent was not a candidate for admission, and that a part of the decedent's problem was that he had reduced his medication intake. Dr. Coffey advised Mrs. Johnson that Mr. Johnson should increase the dosage of Sinequan, should follow the treatment plan under the supervision of Dr. McDonald and local mental health staff, and that Dr. McDonald should re-evaluate the decedent in one week to determine whether the change in medication dosage was helpful.
12. At approximately 5:00 p.m., on January 13, 1992, Dr. Coffey attempted to telephone Piedmont Area Mental Health Center. However, there was no answer. He made no further attempt and did not advise anyone at the Piedmont Area Mental Health Center that Mr. Johnson had been denied admission to Broughton and had been sent home.
13. On January 14, 1992, the decedent stayed in his room and slept most of the day. This was not unusual, given the increased dosage of his medication, which caused him to sleep.
14. On January 15, 1992, Mrs. Johnson got up and made soup. She did not disturb the decedent, but instead left their house to perform some errands. Upon returning, Mrs. Johnson ate lunch and went to her husband's bedroom to give him medication. When she opened the door, Mrs. Johnson found the decedent lying on the bed, dead of a self-inflicted gunshot wound to his head.
15. Plaintiff offered expert psychiatric testimony of Dr. John Billinsky, Sr., who rendered an opinion that Dr. Coffey was negligent in either not admitting or providing a more comprehensive alternative to admission (for the decedent), and the Full Commission finds as a fact that such negligence was the proximate cause of decedent's death by his own hand. On other occasions when decedent expressed thoughts of suicide, intervention by hospitalization at a mental health facility had kept the ideation from being turned into reality.
16. The Full Commission finds as fact the following findings by Dr. Billinsky: A patient who presents himself to a mental health facility with a request for admission should be evaluated in such a way that if one is wrong in one's assumptions that the patient is protected, the patient will be protected. Doctor Coffey had available to him information that this patient was (indeed only hours before he saw him) talking about suicidal thoughts and feelings. He had available to him information concerning previous suicide attempts, not gestures but attempts, of high lethality. He knew that this individual carried a diagnosis of chronic schizophrenia which in many studies indicate that there is a higher suicide rate of completed suicide in schizophrenia than in depression, and he believed strongly that this individual had a personality disorder, even to give it as a diagnosis. This is another risk factor for impulsive suicide. Regardless of any agreements or lack of agreements between the facility and the mental health center, good medical care says that if you evaluate and do not hospitalize someone who is depressed and thinking about suicide, you must have a very good close, careful follow-up plan. To call the mental health center next week, to put the burden on a chronically mentally ill patient, is inadequate and inappropriate. Had Dr. Coffee examined the records, the old records, more carefully, he would see that the relationships between the deceased — now deceased, his mother, and wives had been problematic and had been issues in disposition, in other words, where he would go when leaving the hospital, on the occasion of prior hospitalizations. To suggest that they were the appropriate and adequate support system for him in lieu of admission without evaluating the quality of that relationship at the time of the proposed admission was inappropriate and inadequate. Simply suggesting to the patient to simply increase his Sinequan was pharmacologically inappropriate. The information he had been given and what he observed was a patient who was already oversedated. The only immediate effect of increasing the Sinequan would have been to sedate the patient even further. One would not have assumed any antidepressant effect for ten days, two weeks, maybe more, from an increase. And the irony is that if you have any question about the danger of a patient, it's so much quicker and easier to admit them to the hospital than to do all the things you have to do to safely divert an admission.
17. The Full Commission further agrees with the testimony of Dr. Billinsky to the effect that the "Standard of medical care would have been that the referring agent, whether that be a doctor, or a social worker, or whoever, was informed that the patient wasn't being admitted, although it, frankly, would be just a tad pompous to say, `I'm not going to admit the patient.' It would have been, `I'm inclined not to. What can we work out to make sure the patient is adequately cared for in the community?' That didn't happen. That should have happened regardless of any single portal agreement, or whatever, if we're talking now what's good medical care, and that's the same whether we're talking about Broughton or Anchorage, Alaska or Tucson, Arizona."
* * * * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
CONCLUSIONS OF LAW
1. The plaintiff bears the burden to prove by the greater weight of the evidence through expert witnesses that the examining physician failed to meet the standard of care. N.C. GEN. STAT. § 90-21.12, Assaad v. Thomas, 87 N.C. App. 276,360 S.E.2d 503 (1987), app. dism., disc. rev. denied.,321 N.C. 471, 364 S.E.2d 917, reh'g denied, 321 N.C. 747,366 S.E.2d 856 (1988); Ballenger v. Crowell, 38 N.C. App. 50,247 S.E.2d 287 (1978).
2. In the present case, the plaintiff has proved by the greater weight of the evidence that Dr. Coffey failed to meet the standard of care, both by failing to admit a suicidal mental patient and by failing to advise the patient's mental health caretakers in the patient's home community of the decision not to admit so that such caretakers could take appropriate action on a local level.
3. Such negligence on the part of the Defendant proximately resulted in the death of Rannie Melton Johnson, Jr.
4. Plaintiff has been damaged to the extent of $100,000.00 by reason of the negligence of Defendant.
* * * * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of Deputy Commissioner Dollar and enters the following:
ORDER
1. Defendant shall pay to the Plaintiff the sum of One Hundred Thousand Dollars ($100,000.00).
2. Defendant shall pay the costs.
 S/ ________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _______________ COY M. VANCE COMMISSIONER
DISSENTING: SEE DISSENTING OPINION
S/ _________________ DIANNE C. SELLERS COMMISSIONER